OF

# PENNSYLVANIA.

6 Wh  9
28 SC  510

EASTERN DISTRICT, DECEMBER TERM, 1840.

[PHILADELPHIA, 1840.]

## ARROTT *against* BROWN.*

### IN ERROR.

1. The general rule is that for an agent's omission to keep the principal regularly informed of the agent's transactions, and the state of the interests intrusted to him, the measure of damages is to be proportioned to the actual loss sustained by the principal.

2. An exception to this rule is where the information transmitted, is such as may induce the principal in the adaptation of his operations to his means, to rely on an outstanding debt as a fund on which he may confidently draw : in which case the agent makes the debt his own.

3. The case of *Harvey* v. *Turner* (4 *Rawle*, 223,) commented upon.

THIS was a writ of Error to the District Court for the City and County of Philadelphia, to remove the record of an action on the case brought by Andrew Brown against James Arrott.

The plaintiff was a manufacturer of linen goods, at Dundee, in Scotland, and had made several consignments of his goods to the defendant, who was a merchant in Philadelphia, for the purpose of sale on commission.

* This and the next following case were argued at March Term, 1840.

VOL. VI.—2

(Arrott *v.* Brown.)

This action was brought to recover damages for an alleged breach of the defendant's duty as agent, in respect to the sale of certain of the goods.

On the trial in the Court below, before PETTIT, (President) on the 12th of November, 1839, it appeared that the defendant, on the 22d of September, 1822, had sent ten bales of these goods, for sale, to one James Young, of Boston, who sold the same, but failed, without paying over the proceeds.

The principal subjects of dispute on the trial, were the liability of the defendant for this debt of Young; and also for a sale made by him in June, 1822, to one Folwell, in Philadelphia, who likewise failed without paying for the same. The plaintiff sought to charge the defendant with these debts, on the ground that, by his negligence and failure to give due notice to him, the defendant had made the debts his own.

The plaintiff wrote to the defendant on the 22d of May, 1822, authorising him, in case any of the goods were unsaleable with him, to send "a few bales to Baltimore, or any of the neighbouring cities," if he thought it advisable, taking care to put them in safe hands.

The defendant wrote to the plaintiff on the 15th of June, 1822, stating that the articles of ducks and dowlas never were, and he feared would not be very soon saleable in the Philadelphia market; adding, that he would do the best with his, the same as if they were his own; and if he should learn of a better market within the states for them, and it should be his business to inquire, would send them to it without waiting his orders.

It appeared from the evidence, that Mr. Perit, of Philadelphia, had received in the year 1822, from S. and T. H. Perkins, an eminent commercial house of Boston, a letter, recommending in strong terms, one Mr. Andrew Thomson, a merchant of Scotland, who had resided a good deal in Boston, and requesting Mr. Perit to furnish him with introductions to his friends.

Mr. Perit accordingly introduced Thomson to the defendant; and at his recommendation of Young as a suitable person for that purpose, Arrott sent to him ten bales of the plaintiff's goods, and four others from another consignor, requesting him to dispose of them soon after arrival at the best prices. A correspondence then took place between Arrott and Young, of which the material parts are here given.

On the 22d October, 1822, Young wrote to the defendant that he had tried three bales at auction, which had been sold at rates

(Arrott *v.* Brown.)

which he mentioned—two of them bearing the plaintiff's mark, and the other that of the owner of the residue of the goods; and on the 13th of November wrote that he had made another attempt to dispose of the linens, at auction, but stopped the sale, the prices being so unfavourable; and communicated an offer from a private house, of eighteen cents for the dowlas. This offer the defendant declined, but expressed his willingness to let the dowlas go for nineteen cents to an undoubted house, and the sheetings at twenty-four to twenty-five cents. On the 22d of December, Young wrote to the defendant that, not having met with a better offer for the dowlas than eighteen cents, it was still unsold, and in his opinion had better be held until spring, or at least till an improvement in prices. No farther correspondence took place between them on the subject until the following spring. On the 19th of April, 1823, the defendant requested Young to advise him of his prospects. The latter in reply, stated that he had not been able to sell the linens at private sale at the limits, but had from time to time disposed of a few of them, by auction, at nineteen to twenty cents for the dowlas, and about twenty-four cents for the sheetings. On the 21st of May, Young wrote to the defendant that he had sold some more of the dowlas at twenty cents, at which he expected soon to close sales. On the next day, and before he had received Young's last, the defendant wrote to him that, since his letter of the 23rd ulto., he was without any communications from him, although daily expecting to hear, and also to receive an account-sales of linens so far as they had been made, accompanied with a remittance; and on the 25th of May, he wrote to Young that when he had closed sales of the dowlas, &c., he would be very glad to receive accounts of the same, with a remittance. On the 3d of July, the defendant wrote to Young that since his of the 21st May, he was without any communication from him, and referring to his own of the 22d and 28th of May, requested account-sales at as early a day as possible, to be incorporated into his own account-sales, which he desired to send by his nephew, David Arrott, who was to sail for Liverpool on the 20th of July.

On the 16th of July, Young enclosed an account-sales, by which it appeared that he had sold the whole of the goods, to the amount of about $2,700, of which $1,887 belonged to the plaintiff. By the terms of the credits, about one half of these sales would be due by the end of-July; a portion of them having matured in the previous spring. These last were the credits upon goods sold in the autumn; as to which it appeared that Young had, in reality, sold in the autumn a greater quantity of goods than his letters to the defendant had announced.

On the 22nd of July, the defendant drew on Young, at three days

(Arrott *v.* Brown.)

sight, for $1,350 19 the amount of sales for which he would be in cash, on the 30th of that month, after deducting charges.

This draft Young was unable to pay, having, as he stated, anticipated the amount of the sales from the auctioneer, in order to meet some pressing payments. His first open act of insolvency was the dishonour of this bill.

Mr. Arrott, after advising with counsel in Philadelphia as to this debt of Young, went on to Boston, and consulted Mr. Hubbard, an eminent professional gentleman of that city, who, however, being of counsel for the Messrs. Andrews, who had an interest adverse to that of Young, recommended the defendant to employ Mr. Sullivan, which he accordingly did.

It appeared that Winslow, Channing & Co., of whom Mr. Sullivan, jointly with Thos. H. Perkins and Isaac Winslow were assignees, had advanced money to persons, of whom Young was one, to purchase, and load, and send to Africa, a vessel to bring back a cargo. That vessel, and outward and homeward cargo were pledged to Winslow, Channing, & Co., and came into the hands of the assignees. It was .expected that Young's part of this property would be sufficient to pay the demands of Winslow, Channing, & Co., and leave a surplus for his own use; but a litigation arose between Young and his co-partners in the adventure, which was pursued in the Admiralty Court, and in the state court. Acting for the assignees of Winslow, Channing, & Co., Mr. Sullivan attended to these litigations as to the amount of their interest; and that claim being satisfied, further attended to them in order to increase the amount which might fall to Young's share of the residue of the African adventure, to secure payment of Arrott's demand. The defendant pressed Young very earnestly for payment, who gave him an order for 10s. in the 20s., on Isaac Winslow, who held the money under the assignment, and who accepted the order conditionally. The claim of Winslow & Co., being satisfied, a balance remained, which Andrews claimed as a creditor of the partnership in the vessel of Young and Andrews; and Young claimed the same balance as creditor of the partnership. Young and Andrews engaged in litigation, and joined in a suit against the assignees for the balance, which would have been paid but for the acceptance of Winslow in favour of Arrott, which had been previously obtained by him. Mr. Sullivan defended this suit to have out of the balance the sum intended for Arrott. The court ordered judgment and execution for the plaintiff. Young had no property but his interest in this fund.

In compromise of the defendant's claim, Mr. Winslow proposed to pay him six hundred dollars, which he was willing to accept, and give up Winslow's acceptance, reserving his claim against Young

(Arrott *v.* Brown.)

personally. But the parties in Boston insisting on Young's discharge, which Arrott did not feel himself authorized to give, the negotiation fell through.

Mr. Hubbard testified that he thought at the time the arrangement made by the defendant in procuring the order of Young, and conditional acceptance of Winslow, a very favourable one for him, and that he had shown great skill and judgment in obtaining it; and that he believed until the year 1826, that Arrott would eventually realize more for the order than any of the separate creditors of Young, except Wm. Andrews; believing that a compromise would be finally entered into, by which he would secure from 20 to 25 per. cent of the principal of the debt. He was of opinion that the defendant did adopt, at the time, the best and most prudent measures in his power for the purpose of securing the debt; and that he could not have adopted any measures more likely to obtain security or payment of a part of it: but he did think in 1826 it would have been wise on the part of the defendant or his principals, if in his or their power, to have made a compromise with Winslow and Young, and have given Young a discharge in full.

This step taken by the defendant to secure payment before Young, and the causes of his eventual want of success to realize any thing from the debt, were fully stated in the deposition of Mr. Sullivan, and the correspondence between him and the defendant, which were read in evidence on the trial.

A number of witnesses were examined by the defendant, under a commission to Boston, to prove that Young's mercantile credit and standing were fair during the years 1822 and 1823 to the time of his failure.

No written notice was given by Arrott to Brown of his having sent the goods to Boston, nor of the failure of Young, till the 7th May, 1824, when he wrote as follows:

"I have been endeavouring to bring your sales to a close in order to hand you the same, but it has not been in my power to do so completely: and in consequence of David's wishes, I have concluded upon making them out so far as they have been effected, with a statement of what remains on hands. It is at his request I send this line, otherwise I would not have written you for a few weeks yet to come, being anxious when I did write, to be able to say how many shillings there would be in the pound coming from a bad debt, made on your account at Boston, to the amount of upwards of $1800, and up to this day I cannot tell. The instant I knew your property was in jeopardy, I went on there on purpose; and after waiting 14 days, and doing every thing man could do, succeeded in getting 10*s.*

(Arrott *v.* Brown.)

in the pound, as I thought and still think; but there is no dependence upon any security until the money is actually paid; which the lawyer thinks may be the case in July. The whole amount of the debt was $2700; the balance is on account of my brother-in-law, Mr. David Lumgair. This bad debt has preyed on my mind very much, and one reason for my silence was, when I did write you about it, that I might be able at the same time to say, not that I have *secured,* but that I have actually received 10 shillings in the pound, which I was in hopes of getting before this day. If I had had money to have sent you, you should have got it, or good news of any kind to communicate, you should have heard from me, but to have nothing to write about, save bad debts, bad sales, &c., it was to me an irksome task, and is so now, but David has this morning insisted on my writing, and I remain," &c.

To this letter the plaintiff replied on the 21st June, 1824.—" I have received your favour of 7th ult., and regret the accounts it contains are so very unfavourable with regard to the shipments I had made to you. I hope you will get the whole cleared off soon, and send me account-sale and remittance. As to the bad debt you have made in Boston, you will excuse me for holding you responsible to me for it, since my instructions to you on the 22d May, 1822, were, if you had occasion to send a *few* bales of my goods to Baltimore, or any of the neighbouring cities, you would take care to put them in *safe* hands. I was perfectly satisfied when they remained in your hands; there was no risk, and I wished if they were removed, to be in the same situation; besides your not advising me of the bad debt till long after it had happened, takes all responsibility from me, although the goods had even been sold at my risk. I regret this occurrence extremely, and hope you will not find the loss serious."

To this letter the defendant never replied.

On the 23d, 1824, David Arrott wrote from New York to the plaintiff:—" The enclosed packet containing your account-sales, and account-current made up to the 31st ult., I brought on from Philadelphia yesterday, in order to despatch by this opportunity. My uncle desired me to say that he would be writing at length regarding them, and also of the goods remaining on hands unsold. I was extremely sorry to hear on my return to this country, of the bad debt made on your account in Boston, but I trust there will be 10 shillings in the pound sterling got from Young. My uncle went on himself to Boston, and did every thing in his power to get secured in what he could, but of these particulars he will be writing you himself. Sales of all kinds of bleached sheeting are very dull both here and in Philadelphia."

(Arrott v. Brown.)

The account sales referred to in the last letter, entitled sales per sundry vessels, showed as follows:

Net amount sales     .          .          .          $6398 85
    Of which at Baltimore,     897 28
    Boston, by Jas. Young,    1887 70
                          ——————
                                             2784 98
                                             ————————
              And the residue            $3613 87 at Phila.
                                             ════════

Account current referred to in last letter.
        Dr. Plaintiff,
            To charges,          $2532 89
            Bills of exchange,    9431 23
            Bal. Int. Column,      374 99
                              ——————
                                             12339 11
        Cr. . By total sales,      .    13931 36
    Less sales,
        To Jno. Folwell,        $283 50
        By Jas. Young, at Bos.  1887 70
                              ——————— 2171 20
                                           ————————
                                             11760 16
1824, May 31.                              ————————
    Balance in cash due by plaintiff to defendant,   $578 95
                                             ════════

David Arrott, whose deposition was taken by the defendant, testified "that in the month of July, 1823, he sailed for Europe from Philadelphia: for six years previously he had lived with defendant as his clerk, and was intimately acquainted with his concerns. He knew of several consignments to the defendant by the plaintiff in the spring of 1822, and that the defendant sent a part of said goods to Boston, and consigned them to James Young at that place for sale, the market being bad for the goods at Philadelphia. He sent at the same time to Young, some of the goods of the plaintiff, and some goods which had been consigned to the defendant by David Lumgair    *      *      *  On the day of deponent's departure or the day before, defendant received an account of sales, but no remittance. That the defendant gave this deponent particular instructions to see the plaintiff, and to inform him of the state of his consignment particularly, and of the sales which had been made at Boston; and gave deponent a short letter of introduction to the plaintiff, and a recommendation to Mr. Brown of deponent's house at New Orleans, which was just then established. That shortly after the deponent's arrival in England, he went to Scotland, and in August or September, 1823, he visited the plaintiff at Dundee, and made him particularly acquainted with the state of his consignment,

and of the sales made at Boston. The plaintiff inquired of deponent what prices the goods brought at Boston, and the deponent informed him: a good deal of conversation took place between the plaintiff and the deponent, but the plaintiff made no complaint or objection to the defendant's having sent the goods to Boston for sale, nor to any other particular of the defendant's conduct in the management of the business. That the deponent shortly after went to England, and whilst there he received a letter from the plaintiff, inquiring of him if he had heard from his uncle the defendant, which letter the deponent answered, and in that letter, or verbally in a visit which he shortly afterwards made to Scotland, again he informed the plaintiff that he feared something had happened in Boston, as he heard incidentally from a friend at New York that his uncle had passed hastily through that place on his way to Boston."

*Cross-examined.*—"The goods were sent to Boston in April or May, 1822. Mr. Arrott received no regular account-sales until the sales were about to be closed. Deponent thinks he was advised of sales as they were made by letter, but no regular account-current was forwarded until the close. 　*　　*　　*　When the deponent was at Dundee, he had no copy of account-sales from Young, and of course showed none to plaintiff. Deponent cannot say how many packages of goods had been sent, or how many he informed plaintiff had been sent. Deponent has not the letter from plaintiff to him; it is now in New Orleans, if in existence. Deponent sailed for Europe the 20th July, 1823. About the time deponent went to Europe, he had established himself in business, and had left the defendant's counting-house."

On the 27th June, 1822, the defendant sold to Folwell two bales of the plaintiff's goods for the sum of $283 50, at a credit of six months.

The amount of this sale was included with that of a sale of the defendant's own goods in a note of Folwell in his favour at six months for $422 34.

This note was read in evidence by the plaintiff, together with an account dated 1st April, 1823, presented by the defendant to the assignee of Folwell, claiming balance due the defendant of $3216,75 cts.

Also, the assignee's dividend list, which included the defendant's name as a creditor to the said amount.

Also another account subsequently presented, claiming balance of $2892,30, and sixteen years interest.

It was also admitted by the defendant that previous to the receipt of the first dividend, he had released Folwell generally. Evidence

(Arrott v. Brown.)

was given by the defendant that Folwell was in good credit at the time the sale was made.

The learned Judge of the District Court charged the jury as follows:

"This is an action brought by Andrew Brown, of Dundee, in Scotland, against James Arrott, of Philadelphia. The defendant was the factor of the plaintiff. Certain goods were shipped to the defendant to be sold on the plaintiff's account. There are three separate transactions, yet unclosed between the parties, and this suit is brought to settle them. The plaintiff claims a balance of $4445 33, which is made up of the sum of $758 05, proceeds of eighty pieces of linen goods—of the sum of $1887 70, amount of sales of goods consigned by the defendant to James Young, of Boston; and of the sum of $283 50, amount of sales by the defendant to John Folwell, of Philadelphia—interest being calculated to this time and allowance made for certain remittances. As to the 80 pieces of linen goods there is no dispute now. The counsel have concurred in the mode of adjusting that part of the case. In relation to the other two items, however, the defendant denies that the claim of the plaintiff is well founded. As to the Boston debt, the defendant denies all liability for it whatever; except as mere nominal damages for omitting to give certain information to the plaintiff. In reference to the debt of John Folwell, the defendant also denies all responsibility, except as to forty per cent. of it, in the hands of Mr. Folwell's assignees, but which the defendant holds himself ready to account for, as he can at once receive it from the assignees. The interest account being included, the defendant claims on his views a balance in his favour of $5 65, and asks for a certificate to that amount. Another view of the defendant is, that you may find some larger amount for the plaintiff; that you may allow as much more as you may see proper in the way of damages arising from the want of notice, if the plaintiff have actually sustained any.

There are certain general principles of law for the government of principal and factor, which it is the duty of the court to state, and of the jury to enforce, as far as they are applicable to the facts of the case. There is no more dangerous error in reference to the business of the commercial world, than the adoption by a judge or a juror of the notion that he can decide every particular case submitted to him, of a contest between consignor and consignee, by his individual opinion of the honesty and good intentions of the respective parties. In many instances the law has wisely established certain rules which cannot be departed from, without incurring responsibility, no matter how upright may be the object or pure the dispositions of the party. We must not substitute the weakness of our hearts for the strength of our minds: our sympathy for our

(Arrott *v.* Brown.)

judgment. There is frequently an express understanding as to the terms of dealing; for example, in regard to the amount of commissions, merely for effecting sales, or for guarantee. But in almost every transaction between principal and factor, much is left to the operation of the general principles of commercial law, to the custom of merchants generally, or to the usage of the particular trade. These are recognised by courts and juries as necessary elements of the original understanding and contract. Where the parties desire to be governed by other rules, they must say so, and then their own compact, if not in conflict with the law, will bind them. Among the general rules referred to are these: Where a factor is employed to make sale of goods on consignment, he is bound not only to good faith but to reasonable diligence. It is not sufficient that he has been guilty of no fraud, or of such gross negligence as would carry with it the *insignia* or badges of fraud. He is required to act with reasonable care and prudence in his employment, and exercise his judgment after proper inquiries and precautions. If he shut his eyes against the light, or sell to a person without inquiry, when ordinary diligence, (that is, that degree of diligence which persons of common prudence are accustomed to use about their own affairs,) would have enabled him to learn the discredit or insolvency of the party, he will not be discharged from responsibility to his principal. *Story on Agency*, 172–174. On the other hand where the agent has conducted himself according to the usual course of business, and has employed the required diligence in his agency, he will not be responsible for consequences. *Story,* 190. Where the employment of a sub-agent is authorised, he must use the same reasonable diligence in his choice as to the skill and ability of the sub-agent. *Story,* 190. Again, it is the duty of an agent to keep his principal apprised of his doings, and to give him notice, within a reasonable time, of all such facts and circumstances as may be important to his interests. *Story,* 196. In some cases, too, the law goes further than merely to lay down the rule; it prescribes the measure of damage for neglect, even to the extent of a strict penalty. The law not merely says, that the factor is bound to keep his principal informed of all material occurrences, but it also asserts, that where the conduct of the agent is such as to justify the principal in concluding that there is nothing at risk, and to warrant him in carrying on his business, and in making his calculations for the government of his affairs, upon the faith of the safety of the matters under the agent's charge, the agent becomes an insurer for the whole amount. This is the doctrine emphatically laid down by our Supreme Court in *Harvey* v. *Turner,* (4 *Rawle,* 223.) It is the settled law whether we happen to like it or not. For my own part, however, I entirely approve of the doctrine of that case. There is no more hardship in it than in the instance of a guarantee commission where the agent takes the debt on himself. The agent there is not allowed to say, I

acted honestly and honourably in making the sales, and it is therefore unjust to fix me for the loss of the debt. The legal effect of his contract is that he must pay at all events. So the legal consequence of the omission to discharge a very simple and well known duty relative to giving information, is the same. The agent performs this easy duty, and he is free; he fails to perform it, and he is bound. It is an ingredient of the compact that such shall be the results. The rule ought not to be relaxed. Some sound reasons for a rigid enforcement of it are stated by the learned judge who delivered the opinion of the Supreme Court in the case above mentioned. Then the question is presented, do any of these rules apply to the facts before us? As to Young's debt. Young resided in Boston. The defendant was bound to sell here only, unless he obtained permission to try another market. He relies on the plaintiff's letter of 22d May, 1822 which contained this clause: "If any of my goods are unsaleable with you, you may send a few bales to Baltimore or any of the neighbouring cities, if you think it advisable, taking care to put them in safe hands." On the 22d of September, 1822, the defendant sent on consignment to James Young of Boston ten bales of linen goods. It is conceded that the goods were unsaleable here, and that a *few* bales could be sent to a neighbouring city. But the plaintiff denies that Boston was a neighbouring city; and that ten bales were within the authority. If there are any ambiguities in these respects in the plaintiff's letter, he is not to take advantage of them. I should rather incline to adopt the plaintiff's own view, as stated in his letter of June, 1824, where omitting any reference to these points, he confines his complaint to the two matters of "safe hands" and "*want of notice.*" If it becomes necessary, it will be for the jury to decide whether on this part of the case, the defendant exceeded his authority. As to the *safety* of the hands to which the goods were sent, the letter of the 22d of May, 1822, is not to be construed as containing a stipulation that the defendant should be answerable at all events for the safety or solvency of the party in whose hands he might place the goods. The letter required only reasonable care and diligence in the selection of the person to whom the goods should be sent.

[The judge here reviewed the testimony as to the choice of Mr. Young and as to his commercial standing, and said that if necessary to be decided it would be for the jury to determine whether the defendant did or did not use due diligence and make proper inquiries before sending the goods to Boston.]

But assuming all the points of the case thus far to be in favour of the defendant, the plaintiff contends that there is still what he terms an overwhelming neglect or omission of the defendant in regard to giving material information, which completely fixes the debt on

(Arrott *v.* Brown.)

the defendant. The goods were transmitted to Boston in September, 1822. In July, 1823, the defendant was induced by a difference between Young's previous letter and his accounts now furnished, to suspect Young's situation. He immediately put him to a test, by means of the draft for $1350, which proved his insolvency. To say nothing of other omissions, particularly of the omission to inform the plaintiff of the consignment to Boston, prior to Mr. David Arrott's visit to Scotland in August or September, 1823, the defendant, for nine months after Young's insolvency was made manifest to him, omitted to give any notice whatever of the circumstance to the plaintiff. Here was a material fact which the plaintiff had a right to know, and which the defendant was bound to communicate. Nine months elapse before the defendant informs the plaintiff of any difficulty. The defendant concedes the omission to perform his duty, but contests the question of the measure of damages. It becomes my duty here to state distinctly what the law is on this point. A factor, though a sub-agent, sells goods on credit—sends his principal verbal notice, (after a delay of many months,) of the consignment, and of sales having been made—ascertains the insolvency of the consignee after there had been money in his hands—and then waits nine months before making any communication to the principal. Now, unless we are ready to overthrow the settled law of the land, I have no hesitation in saying that by the omission for so long a time to give notice of Young's insolvency, the defendant made the debt his own, and that the plaintiff is not bound to offer evidence to show actual damage. The plaintiff has a right to claim of the tribunals of this country, the benefit of the law of the land. He may say, I have made my calculations on the faith of the safety of these sales. I had a right to carry on my business on this faith. The effect of this delay is the same as if he had charged a guarantee commission for making the sales. I put it to you then unequivocally, that the measure of damage is the whole amount of the debt. A plainer case for the application of the doctrine could not, I think, be suggested. We are not at liberty to say, that perhaps the principal did not during the nine months, rely on the safety of his debt. All that the law requires is that he might have done so. In the view I take of the law of this part of the case, it is unnecessary to inquire as to the alleged vigilance of the defendant in his efforts to secure the debt in Boston.

Then as to Folwell's debt.

The goods were sold in June, 1822, at six months; at the time of the sale, Folwell was in good credit. Before the expiration of the credit, account-sales in part were transmitted by the defendant to the plaintiff, and a remittance made which covered this amount. This remittance would not conclusively bind the defendant. On the face of the account, it appeared that sales on credit had been made. That, however, did not prevent the defendant from re-charging the

debt on Folwell's failure, provided the defendant gave notice of such failure within a reasonable time. The fact that the money had been remitted, was perhaps an additional reason for prompt notice. It is a remarkable fact, that no notice was given of Folwell's failure, till June, 1824. The whole of 1823 was allowed to pass by without a hint of it, and at last it was intimated only by a re-charge in an account-current; and even this, it is urged, was not a full account, as 25 per cent. had then been secured, which fact was not communicated. But here the rule of law is the same as to the want of notice, as I have stated it to be in reference to Young's debt. When Folwell failed, it was incumbent on the defendant to give notice within a reasonable time, and he omitted to do so at his own peril. If this were all of the case, it as strong as Young's. Nine months delay is bad enough. Eighteen months delay is no better. It has, however, been contended, that the plaintiff was bound to reply to the information of Folwell's failure, and that his silence is an acquiescence, or evidence of an acquiescence, in the re-charge. There is neither law nor reason for this suggestion. For 18 months the plaintiff had a right to consider the money as his own, and after that lapse of time, he could not be affected by a recharge without his express consent to it. But if a recharge could have affected the plaintiff, it appears that this recharge did not give full information. If it was a mere recharge to credit in a new account, it was open for further explanation, and is not to be deemed as a charge of the whole amount. If the defendant's liability was fixed before, then no effort of his could release him, without the plaintiff's consent.

On the two disputed points of the case, I charge you that from the delay to give material information, the defendant made both the debts in point of law his own. If wrong in this opinion, the Supreme Court will correct the error. I shall be happy to facilitate the steps proper to bring the case before them."

The jury found for the plaintiff, and a writ of error having been taken, the following errors were assigned.

" 1. Because the judge erred in his charge upon the subject of the measure of damages.

2. Because the judge refused to charge as requested in the 9th, 10th, and 11th points, that the omission to communicate to the plaintiff the failure of Young, did not make the defendant liable to the plaintiff for any thing beyond the amount of the actual damage sustained by the plaintiff in consequence of such omission, and beyond what the jury might believe equivalent to an indemnity therefor; and that the law did not make the amount of Young's debt the measure of this indemnity.

3. Because the judge refused to charge as requested in the 15th

(Arrott *v.* Brown.)

point, that the whole case was open to the jury to find a verdict either for the whole amount of the debt, or for such less amount as might in their belief afford to the plaintiff an indemnity for any actual loss or injury which might have been occasioned by the omission to communicate.

4. Because the judge erred in refusing to charge as requested in the 12th, 13th, 16th, and 17th points.

5. Because the judge erred in refusing to charge as requested in the 19th and 20th points.

6. Because the judge erred in charging the jury that the effect of the defendant's delay to give notice of Young's insolvency was the same as if he had charged a guarantee commission on the sales.

7. On the subject of the first of the points on which the court was requested by the defendant to charge the jury, the court erred in not charging as therein requested, and in leaving it to the jury whether the defendant exceeded his authority in sending the goods to Boston.

8. The court erred in their charge on each one severally and respectively of the exceptions taken in the court below to the charge of the court which are herewith incorporated and set forth as originally there taken."

Mr. *M'Call* and Mr. *Cadwalader*, for the plaintiff in error, cited *Jamieson* v. *Swainston*, (3 *Campbell*, 546.) *Levison* v. *Kirke*, (*Lane's Rep.* 65.) *Beawes Lex Merc.* 37, tit. *Factors. Paley on Agency, Ch.* 1, *p.* 1, § 3. 1 *Livermore on Agency*, 398. *Russel* v. *Palmer*, (2 *Wilson*, 325.) *Purviance* v. *Angus*, (1 *Dall.* 180.) *Hamman* v. *Cottle*, (6 *Serg. & Rawle*, 290.) *Childs* v. *Corp*, (1 *Paine's C. C. Rep.* 285.) *Van Wart* v. *Woolley*, (3 *Barn. & Cres.* 439 ; 10 *Eng. C. L. Rep.* 145.) *Elliott* v. *Walker*, (1 *Rawle*, 126.) *Mechanics Bank* v. *Earp*, (4 *Rawle*, 384.) *Delaney* v. *Stoddart*, (1 *Term Rep.* 22.) *Webster* v. *De Tastet*, (7 *Term Rep.* 157.) *Gibbs* v. *Cannon*, (9 *Serg. & Rawle*, 193.) *Gardner* v. *Ferree*, (16 *Serg. & Rawle*, 30.) *Bonafous* v. *Walker*, (2 *Term Rep.* 132.) *Mitchell* v. *Penrod*, (8 *Serg. & Rawle*, 524.) *Mott* v. *Danforth*, (6 *Watts*, 304.)

Mr. *Randall* and Mr. *Scott* for the defendant in error, cited *Harvey* v. *Turner*, (4 *Rawle*, 228.) *Walker* v. *Smith*, (4 *Dallas*, 389.) 1 *Gallison*, 360. *Story on Agency*, 213. *Davis* v. *Garret* (6 *Bingh.* 716 ; 19 *Eng. Com. Law Rep.* 215.) *Simpson* v. *Swan*, (3 *Campbell*, 291.) *Hunter* v. *Welsh*, (1 *Starkie, Rep.* 224; 2 *Eng. Com. Law Rep.* 365.) 1 *Livermore*, 368. *Rundle* v. *Moore*, (3 *Johns. Cas.* 37.) *Amory* v. *Hamilton*, (18 *Mass. Rep.* 146.)

(Arrott v. Brown.)

The opinion of the court was delivered by

Gibson, C. J.—The general rule certainly is, that for an omission to keep the principal regularly informed of the agent's transactions, and the state of the interests entrusted to him, the damages are to be proportioned to the actual loss. In *Harvey* v. *Turner*, however, on the authority of which, the jury received the direction that is now the subject of error, it was ruled, and perhaps for the first time, that where the information transmitted is such as may induce the principal, in the adaptation of his operations to his means, to rely on an outstanding debt as a fund on which he may confidently draw, the agent makes the debt his own. Such is the naked principle of that case; and, as an exception, it is entirely consistent with the general rule asserted in *Elliott* v. *Walker*, which has been said to conflict with it. It is undoubtedly an exception; but an exception which, resting on special circumstances, is as undoubtedly a reasonable and a wholesome one. In that case there was something more, however, than mere want of diligence in the transmission of information. There was negligence preceded by a positive act which had tended to beget a confidence not justified by the event, and which, therefore, called upon the agent the more imperiously to neglect no opportunity of removing the false impression which his act of commission had contributed to make. The money had been paid over or settled on account, without the suggestion of a possibility of reclamation. The agent was the party who sought re-embursement; and it was held that his silence for nine months after he had charged himself with the debt in a rendered account-current, had made it his own; the propriety of which it is difficult to doubt. To show by specific evidence a consequential derangement of the principal's plans, and the exact amount of the loss suffered from it, would require him to expose his whole business in all its ramifications and minute details; and to sustain it before a foreign tribunal with all the books and papers of the house, properly authenticated or proved, would be intolerably inconvenient if not impracticable. His other business would in the mean time be left to regulate itself; and it would be found better, in the end, to have given up the claim, than to have pursued it under so many disadvantages. Nor would a jury be able to estimate, with any degree of precision, the loss incurred from a sacrifice of means in providing for sudden and unexpected responsibilities, and from a consequent relinquishment perhaps of profitable speculations. These are considerations which make it more politic and just that the delinquent factor should, in such circumstances, take the responsibility of the debt, and the risk of collecting it, than that the wronged principal should be drawn to define the exact amount of his loss by proofs so vexatious and oppressive.

Such is the principle of *Harvey* v. *Turner*; and do the circumstances of the case at bar fall within it? In respect of Young's debt,

(Arrott *v.* Brown.)

there was nothing to indicate that it might be relied on as a productive source of ready money. Its existence was intimated by an ordinary account of sales, which, however, intimated not that it might be depended upon as peculiarly available; and there consequently was no positive act productive of the confidence which is supposed to have been disappointed by the event. So far as regards the transmission of information, therefore, the jury had to do with an ordinary case of negligence falling within the general rule; and consequently nothing of that sort called upon them to give damages beyond the amount of the loss shown to have been actually suffered.

It may, however, become a grave subject of inquiry before another jury, whether the defendant's supineness in suffering the goods to remain with Young after his apparent default in respect to remitting the proceeds of the bales sold at auction, ought not to fix him for the whole. If it turn out that Young failed to do what, under the circumstances, he was bound to do, it will be the business of the judge to charge that it was the defendant's duty to take the residue of the goods out of his hands; and failing to do so, it could not be said that the actual extent of the damage suffered, is less than the value of the goods lost by it.

In respect to Folwell's debt, it is entirely clear that the defendant's responsibility stands on the general rule that the damages are to be in proportion to the loss actually incurred from the negligence.

Judgment reversed, and *venire de novo* awarded.