## Brown *against* Arrott.

In a suit by a principal abroad against his factor here, seeking to charge him with losses occasioned by his negligence, the defendant cannot, to show he had kept the plaintiff informed of his doings, give in evidence a deposition stating that the defendant gave the witness particular instructions to see the plaintiff and inform him of the state of his consignment particularly, and the sales made, when the witness states he had no copy of account sales, and showed none to the plaintiff, and sales had long before been made of which no account had been sent.

A factor is liable for a loss arising from his neglect to keep his principal informed of matters material to his interests.

Evidence is not admissible on the part of a factor, in a suit by the principal against him founded on the factor's negligence, to show that it is not usual for factors to transmit to their principals monies received by them as long as any part of the consignment remained unsold, or if sold, as long as any part of the monies remained unpaid, though the honesty of the agent is not disputed and there is no ground to believe the monies might thereby be lost.

A factor is bound to remit to his principal the monies received from sales of a consignment, unless there be an agreement or custom of trade, and if the latter be himself the factor of a principal abroad, he is bound to call on his factor in this country to transmit monies received when he is informed of it, and if the money is lost by neglect to do so, he is answerable.

In October or November 1822 the defendant was apprised of a sale by his agent in Boston payable in February or March. In May the defendant wrote stating he expected an account and remittance. Six days after he wrote that he need not make a partial remittance, but to push the sales to a close and remit the whole at once. In March the agent acknowledged to him his inability to meet a note to the defendant, payable in a few days, and no advice was sent by the defendant to the principal abroad till the agent became insolvent. *Held* that the defendant was responsible for the loss of the goods and monies.

Where on the facts presented the defendant is liable for a loss occasioned by his negligence as a factor, the onus of proving what the actual loss was, lies upon him and not on his principal, and in the absence of such proof the full value of the goods, or at least of the money produced by their sale, is the measure of damages.

The factor sold goods to J. F. on a credit of six months, taking a note payable to himself, including in it a debt owing to himself, and afterwards released to J. F. and came in under his assignment. *Held* that he made the debt his own by blending it with his own money and releasing J. F. without authority.

ERROR to the District Court for the city and county of *Philadelphia,* in an action of assumpsit brought by Andrew Brown

[Brown v. Arrott.]

against James Arrott, in which a verdict and judgment were rendered for the defendant. It was the same case which is reported at large in 6 *Whart.* 9, by the name of *Arrott* v. *Brown*, a verdict having passed in the first trial in favour of the plaintiff, Brown, which was there reversed, and on the second trial the verdict passed for the defendant, Arrott, on which the present writ of error was taken out by the plaintiff, Brown. The facts of the case are fully stated in 6 *Whart.* 9, and it will only be necessary to report the new evidence given on the present trial.

The defendant, with a view to show that there was nothing calculated to excite the defendant's suspicion in Young's omission to remit the amount of the sales made in the fall of 1822, proposed to prove by Samuel Comly and others " that in consignments to commission merchants between the different cities of the United States, and between Philadelphia and Boston, it is not, under ordinary circumstances, the practice to make or require partial remittances of occasional sales made, before closing sales of consignment." The plaintiff objected to this offer, and contended that it was illegal. The judge decided that when it was reduced into the form of a question to the witness he would allow it.

Samuel Comly then testified that he was a commission merchant and had, to a large extent, received and sent goods on commission, to and from other cities of the Union.

The defendant then asked the witness, " From your experience of sales by a commission merchant, is it usual or not to make remittances before closing sales of consignment without special directions to do so ?" The question was objected to by the plaintiff, but the objection was overruled by the court, and the plaintiff excepted. The witness then answered, " It is not usual."

The defendant then asked the witness the following question: " Under ordinary circumstances, do parties consigning goods to a commission merchant require payment of the amount of occasional sales of parts of a consignment before closing sales of the consignment ?" This question was also objected to and the objection overruled by the court, who sealed an exception. The witness then answered : " Under ordinary circumstances, I think they do not draw for partial sales till the sales are closed."

Question. Is your answer to be understood as applicable to cases in which part of the sale is made in the fall, and part postponed to the spring? (Objected to as before.) Answer. Yes, it is; where there is confidence between the parties it is not usual to draw. Such has been my practice.

This witness further testified : " I have done business with other parts; with New York, Boston, Baltimore and Charleston. I would draw upon them for sales; they would consign to me and draw upon me. Our sales were rendered to each other whenever an invoice was closed. As a general rule, this closing would occupy from one month to two or three or four months. My bu-

siness here was all on a large scale; and with the houses here, at the eastward, a reciprocal business."

Re-examined. I have also done a considerable business for the neighbouring cotton manufacturers. Sometimes in small amounts.

Joseph Cabot testified, under the same exception to his testimony: "I have been and still am a commission merchant. In my mercantile business have also been in the habit of consigning goods to others for sale. Answering from my experience, it is not customary to remit until sales are closed. I have no doubt about the fact that the custom is to remit only at the close of the sales, unless specially directed to do it. There have been cases where parties wanting money have requested remittances as sales are realized. Under ordinary circumstances I should think it not customary to do so, (that is, where advances are not asked.) My answer has reference to all sales; would not be excluded by applicability to cases of sales, part in fall and part left for spring. I came to Philadelphia from Boston, in 1815. I had been in business in Boston before I came here."

Cross-examined. (In answer to a special question.) If I had received goods on consignment from abroad, and had advanced on them, and had sent part of those goods elsewhere and had heard of sales of part of those goods, I should have considered it my duty to call in the proceeds at maturity.

Re-examined. (In answer to a specific question.) I mean this answer in a case where I had made a special advance on the particular goods.

Re-cross-examined. (In answer to a question.) But if I had made a remittance on general account, I should consider the case the same as a special advance, and my duty to call in the funds the same.

The defendant offered to read the deposition of David Arrott of New Orleans, merchant, taken Oct. 3, 1828. The plaintiff objected to the following italicised portions of the deposition as illegal testimony. The judge overruled the objection and decided that the parts objected to should be read, and sealed an exception.

The deposition was then read as follows: In the month of July 1823, he sailed for Europe from Philadelphia. *For six years previously he had lived with the defendant as his clerk, and was intimately acquainted with his concerns.* He knew of several consignments to the defendant by the plaintiff in the spring of 1822, and that the defendant sent a part of said goods to Boston, and consigned them to James Young at that place for sale, the market being bad for the goods at Philadelphia. He sent at the same time to Young some of the goods of the plaintiff, and some goods which had been consigned to the defendant by David Lumgair  *  *  *  (the part omitted here being objected to by the plaintiff, was not read in evidence,)  *  *  *  (verifies the invoices of the goods:)  *  *  *  (verifies certain letters from

plaintiff to defendant :)     \*     \*     \*     On the day of deponent's departure, or the day before, defendant received an account of sales, but no remittance. *That the defendant gave this deponent particular instructions to see the plaintiff, and to inform him of the state of his consignment particularly, and of the sales which had been made at Boston,* and gave deponent a short letter of introduction to the plaintiff, and a recommendation to Mr. Brown, of deponent's house at New Orleans, which was just then established. That shortly after the deponent's arrival in England, he went to Scotland, and in August or September, 1823, he visited the plaintiff at Dundee, *and made him particularly acquainted with the state of his consignment, and of the sales made at Boston.* The plaintiff inquired of deponent what prices the goods brought at Boston, and the deponent informed him; a good deal of conversation took place between the plaintiff and the deponent, but the plaintiff made no complaint or objection to the defendant's having sent the goods to Boston for sale, nor to any other particular of the defendant's conduct in the management of the business. That the deponent shortly after went to England, and whilst there he received a letter from the plaintiff, inquiring of him if he had heard from his uncle, the defendant, which letter the deponent answered, and in that letter, or verbally in a visit which he shortly afterwards made to Scotland, again he informed the plaintiff that he feared something had happened in Boston, as he heard incidentally from a friend at New York that his uncle had passed hastily through that place on his way to Boston.

Cross-examined.—The goods were sent to Boston in April or May 1822. Arrott received no regular account-sales until the sales were about to be closed. Deponent thinks he was advised of sales as they were made, by letter, but no regular account current was forwarded until the close     \*     \*     \*     (the part omitted here was not read in evidence, being applicable to that part of the examination in chief which was objected to by the plaintiff and not read.)     \*     \*     \*     When the deponent was at Dundee, he had no copy of account-sales from Young, and of course showed none to plaintiff. Deponent cannot say how many packages of goods had been sent, or how many he informed plaintiff had been sent. Deponent has not the letter from plaintiff to him ; it is now in New Orleans, if in existence. Deponent sailed for Europe the 20th July 1823. About the time deponent went to Europe he had established himself in business, and had left the defendant's counting-house.

Samuel Snelling sworn, (under the same exception to his testimony as in the case of Comly). I am a commission merchant ; have been so 15 years. I was in business as a commission merchant in Boston. I began business on my own account 20 years ago. On making partial sales it is not usual to make remittances till sales completed. It ought to be said that the custom varies. My

[Brown v. Arrott.]

experience has been to make up sales at closing of the invoice. Whether consignor draws depends upon circumstances, as if an agreement. I should think under ordinary circumstances it is not ordinarily done.

Cross-examined. — By ordinary circumstances I mean where there is nothing peculiar. There is no custom which would render it improper to draw. If sales unclosed for one year it would depend upon circumstances. There is no custom which would interfere with drawing. We generally render our account sales once in the month. Some of our correspondents desire it at the end of the invoice; some at the close of the season, or once in three months. Heretofore we have been generally in advance to our principals, but latterly have adopted a different rule; our practice was to advance about two-thirds, sometimes more. If we charged interest on advances, and had sent part of the goods elsewhere to be sold, we should stop the charge of interest from the maturity of the sales made by our correspondent. If partial sales made, I should not think it necessary immediately to call for the proceeds, but generally at the close of the season. I should ask for the account sales so as to close up my accounts with my correspondents. Leaving the proceeds in his hands would have a tendency to lessen the average due of the whole. When we send goods to a New York house, we desire them to transmit to us the notes endorsed over for better security. Sundry notes for the amount due as per average due time. This is our late practice; adopted since commencement of this year. Formerly, when doing business with commission houses, they would draw on us and we on them. The state of the balance between us on general account would regulate the drawing. I should treat the case of a correspondent for a single consignment as I would others under ordinary circumstances.

Re-examined.—Would you consider the case of a consignment made in the fall, partial sales in the fall, and the balance of goods sold in the spring as an ordinary case? It might be a common case. Do you not believe it is a common case? I do.

Benjamin W. Richards, sworn. (Same exception as before.) I have been a commission merchant 20 years and upwards. It is not usual to make remittances before closing invoices, unless there are special agreements or directions. Under ordinary circumstances parties do not require payment before closing sales of invoice. Suppose a consignment to Boston, part sold at fall sales, balance laid over to the spring; my correspondent a foreign house. Such a case I should consider would fall within the general rule, and it would not ordinarily make any difference which party was debtor or creditor. Interest is generally of course among commission merchants.

Cross-examined.—If I had written to a Boston correspondent on 23d of May, calling for account sales and remittances, and a

[Brown v. Arrott.]

month elapsed without reply, I should think he was deviating from the ordinary course of business.  I should look for his reply in three or four mails at farthest.  I frequently made advances.

Re-examined.—Two intermediate letters on my part would be deemed a sufficient urgency.

The defendant submitted the following points :

1. There is nothing in the evidence that amounts to a guarantee of sales by defendant, and nothing in the declaration that authorizes the plaintiff to recover on the footing of such a guarantee.

2. The guarantee mentioned in the letter of 9th January 1822, is, upon the proper construction of that letter, referable to the auctioneer's guarantee, and not to any guarantee by the defendant himself, of either auctioneers or purchasers.

3. The defendant is not to be held liable for the debt of Folwell, by reason of having included in one and the same note the amount of this and another sale to Folwell.

4. If the defendant did not until June 1824, communicate to plaintiff the fact that this debt had not been paid, the jury are not for this reason to give in damages any greater amount than the loss or injury, if any, which they may believe to have been sustained by reason of the omission to make such communication.

5. The correspondence authorized the defendant, if he thought it best for plaintiff's interest to do so, to send ten of the plaintiff's 80 bales of goods to Boston, to be sold for plaintiff's account in that city.

6. On this subject and that of the next point, if there are any ambiguities in the plaintiff's letters, he is not at liberty to take advantage of them, and they are not to be construed in his favour.

7. The direction in the letter of 22d May 1822, to take care that the goods should be placed in safe hands, is not to be construed as a stipulation that the defendant should be answerable for the safety or solvency of the party in whose hands he might place them.

8. This stipulation only required that the defendant should use reasonable care in the selection of the agent in Boston, in whose hands he might place the goods for sale in that city.

9. If the standing and character of Young were then fair in the general estimation of men of business in Boston, the jury are at liberty from this circumstance to presume that the defendant used reasonable and sufficient care in selecting him as the agent to sell these goods there.

10. This would be the case, although it might now appear that a few persons having peculiar and secret means of knowledge, were then aware of circumstances unfavourable to the situation of Young, not known to the community generally.

11. The omission of Young to make payment at the maturity of the credit of the amount of any partial sale or sales of which advice may have been given by him to the defendant, does not

[Brown v. Arrott.]

involve defendant in any liability to the plaintiff, unless the jury believe that this circumstance was a departure from the ordinary course of business, or was reasonably calculated to take away confidence in Young.

12. The defendant's omission to require payment of such partial sales at maturity, does not involve him in any liability to the plaintiff, unless the jury believe that the omission was one which would not under such circumstances have arisen in the case of persons ordinarily attentive to similar business.

13. If under the circumstances, persons of ordinary attention to business would at discretion have drawn or not drawn for such partial sales at their maturity, the defendant was at liberty to exercise his discretion upon the subject, and ought not to be held liable for any unforeseen consequences that may have since resulted from omitting to draw.

14. If, after this time, the defendant used all reasonable diligence in the pursuit of Young, and acted throughout according to the best of his judgment, under the advice of counsel, he is not answerable for the debt not having been collected from Young.

15. The defendant not having guaranteed any sales made for the plaintiff, and never having rendered any account charging himself with the sales made by Young, until he rendered the account in which they were re-charged to the plaintiff, with information of Young's failure, is not to be held as having in point of law made Young's debt his own.

16. Although the defendant omitted from the summer or fall of 1823, to the spring of 1824, to communicate to the plaintiff the failure of Young and the situation of this debt, yet his omission to make such communication does not make him liable to the plaintiff for any thing beyond the amount of the actual damage or injury sustained by the plaintiff, if any such damage or injury was sustained in consequence of such omission.

17. If the jury believe that he sustained no loss or injury in consequence of the omission to make the communication, and stood in no worse condition than he would have stood in, had there been no such omission, there is no rule of law which makes it binding upon the jury to find a verdict for more than nominal damages.

18. The letter of 21st June 1824, from the plaintiff to the defendant, was not such a one as required an answer in order to preclude the legal implication of acquiescence in its contents.

The judge charged the jury as follows:

The plaintiff claims to recover in this case the sum of $4592.72, which is made up of two items, namely: 1. The difference between the amount for which his goods were sold, as stated in the account current, and the amount actually remitted to him, with interest on this difference, after deducting all the usual charges as

[Brown v. Arrott.]

stated in that account.　2. The proceeds of the 80 pieces of his goods sold by defendant after that account was rendered, together with interest, after deducting the usual charges.　The defendant, on the other hand, contends that he is entitled to be credited in account with the whole of the amount for which certain of these goods were sold by James Young, of Boston, who failed to remit the proceeds to the defendant ; that he is entitled also to be credited with certain expenditures incurred and made by him in prosecuting the claim against Young for these proceeds : and that he is entitled also to be credited with the whole amount of Folwell's note, which Folwell failed to pay and permitted to be dishonoured. If these pretensions and credits be allowed, he brings the plaintiff in his debt, and claims your certificate for the amount which may thus be found due to him.　The plaintiff asserts among other things, that the defendant agreed to guarantee the sales, and refers in proof to a particular part of the correspondence.　You will recollect the argument ; but upon this point it seems to me that the parties themselves thought there was no guarantee.

There are other questions in the case which require your attention to certain rules of law which govern the relation existing between principal and factor.　These rules are as follows : Where a factor is employed to make sale of goods on consignment, he is bound not only to good faith but to reasonable diligence.　It is not sufficient that he has been guilty of no fraud, or of such gross negligence as would carry with it the insignia or badges of fraud. He is required to act with reasonable care and prudence in his employment, and exercise his judgment after proper inquiries and precautions.　If he shut his eyes against the light, or sell to a person without inquiry, when ordinary diligence (that is, that degree of diligence which persons of common prudence are accustomed to use about their own affairs) would have enabled him to learn the discredit or insolvency of the party, he will not be discharged from responsibility to his principal.　*Story on Agency* 172–174. On the other hand, where the agent has conducted himself according to the usual course of business, and has employed the required diligence in his agency, he will not be responsible for consequences. *Story* 190.　Where the employment of a sub-agent is authorized, he must use the same reasonable diligence in his choice as to the skill and ability of the sub-agent.　*Story* 190.　Again, it is the duty of an agent to keep his principal apprised of his doings, and to give him notice within a reasonable time of all such facts and circumstances as may be important to his interests.　*Story* 196.

Then the question is presented, do any of these rules apply to the facts before us ?　As to Young's debt.　Young resided in Boston.　The defendant was bound to sell there only, unless he obtained permission to try another market.　He relies on the plaintiff's letter of 22d May 1822, which contained this clause : " If any of my goods are unsaleable with you, you may send a few

VI. — 52　　　　　2·K

bales to Baltimore, or any of the neighbouring cities, if you think it advisable, taking care to put them in safe hands." On the 22d September 1822, defendant sent on consignment to James Young, of Boston, ten bales of linen goods. It is conceded that the goods were unsaleable here, and that a few bales could be sent to a neighbouring city. It is not denied now that Boston was a neighbouring city; nor that the number, ten bales, were within the authority. Nor is it denied that the letter of 22d May 1822, is not to be construed as containing a stipulation that the defendant should be answerable at all events for the safety or solvency of the party in whose hands he might place the goods. The letter required only reasonable care and diligence in the selection of the person to whom the goods should be sent. Then the question is presented distinctly and fully to the consideration of the jury, whether, in the choice of Young as consignee at Boston, the defendant did or did not use due diligence. He was bound to use that degree of diligence which persons of common prudence are accustomed to use about their own affairs. The outline of the evidence is this. Thompson brought a letter of introduction from Messrs Perkins of Boston. Perit, to whom that letter was presented, introduced him to Arrott. They recognised each other as countrymen and acquaintances. Arrott had Scotch goods consigned to him, on hand. He inquired of Thompson for a fit person to make sale of these goods in Boston. Thompson recommended Young. So far, defendant says, he acted prudently. The plaintiff says, he did not. This is a question for the jury to decide upon. But again, defendant says, that subsequent inquiries show that Thompson's recommendation of Young was well founded. The plaintiff denies this. Here again the jury must decide. If the jury agree with plaintiff on these points, then Arrott is responsible on this ground for any damage the plaintiff actually sustained by reason of defendant's want of due diligence in this matter. If the jury agree with the defendant on this point, then the plaintiff is obliged to confine himself to other grounds; namely—the alleged omission of the defendant to give material information, and the alleged want of proper diligence in conducting the business with Young.

As to the first, the rule has already been stated to be, "That it is the duty of an agent to keep his principal apprized of his doings, and to give him notice within a reasonable time of all such facts and circumstances as may be important to his interests." Here the consignment to Young was made in September 1822. No communication of any kind to plaintiff is made until David Arrott's visit to Dundee in August or September 1823. David Arrott had then a conversation with the plaintiff, and stated probably all he could recollect without documents before him. But, at that time, it seems fair to conclude, he did not suspect Young's insolvency; and he certainly did not communicate any grounds of suspicion to

Brown. The evidence shows that it was at a subsequent period that his own fears were awakened. The plaintiff says, this communication is unimportant, as to the material matters. The defendant deems it material. This is for the jury. But the plaintiff alleges again, that though in the hurry of his departure in July 1823, from Philadelphia, David Arrott did not notice the difficulties on the face of the account just received from Young, yet that the defendant, on reflection and examination, did, and immediately drew on Young for $1350, at three days' sight: that in a few days this draft proved Young's insolvency; and that it was not until the 7th of May 1824, nine months after Young's insolvency was known to him, that he wrote to the plaintiff, or gave him any notice on the subject. The plaintiff, on receipt of this letter of 7th May 1824, promptly replied by letter of 21st June 1824, stating that he held the defendant responsible for the debt made in Boston. Now it is conceded by the defendant, that he was guilty of an omission of duty here; the rule being, as before stated, that a factor is bound to keep his principal informed of all material occurrences in the agency.

The great point of dispute here is the measure of damages. You have heard of former trials of this cause. As you are trying the case with the aid of new light, it would not influence you, I am sure, were I to state what the former jurors did. But as it would do no good, and would be an irregularity, I refrain from referring to their verdicts. As to the law, however, I may make a remark or two. This case was originally tried before the late learned President of this court, Judge BARNES. He stated the law to be, that the jury should determine what amount of damage, if any, a principal actually sustained from want of notice from his agent. Before the same Judge in this court another case, *Harvey* v. *Turner*, had also been tried, in which he had laid down the law in the same way, and on facts which he believed brought the two cases within the same class. *Harvey* v. *Turner* was taken to the Supreme Court, and reversed. (See 4 *Rawle* 229.) A rule for a new trial in this case was still pending. Judge BARNES had left the bench; but on hearing what had been decided on the writ of error in *Harvey* v. *Turner*, he took care to inform the Judges of this court, that in his view, the Supreme Court must pronounce his opinion in this case erroneous also, and stated that it was, of course, his desire, as justice demanded a conformity to the doctrines of the Supreme Court, that a new trial should be awarded. The Judges of this court, after a very careful examination of the whole subject, concurred with Judge BARNES, and granted a new trial. The trial took place, and the law was laid down as the late President, and all of the present Judges of this court, supposed that *Harvey* v. *Turner* required that it should be laid down. The case was taken to the Supreme Court and reversed.

I proceed now to read to the jury the opinion on this branch of

the case, of the Supreme Court, as pronounced by the chief justice: " The general rule certainly is, that for an omission to keep the principal regularly informed of the agent's transactions, and the state of the interest entrusted to him, the damages are to be proportioned to the actual loss. In *Harvey* v. *Turner,* however, on the authority of which the jury received the direction that is now the subject of error, it was ruled, and perhaps for the first time, that where the information transmitted is such as may induce the principal, in the adaptation of his operations to his means, to rely on an outstanding debt as a fund on which he may confidently draw, the agent makes the debt his own. Such is the naked principle of that case, and, as an exception, it is entirely consistent with the general rule asserted in *Elliott* v. *Walker,* which has been said to conflict with it. It is undoubtedly an exception; but an exception, which, resting on special circumstances, is as undoubtedly a reasonable and a wholesome one. In that case there was something more, however, than mere want of diligence in the transmission of information. There was negligence preceded by a positive act which had tended to beget a confidence not justified by the event, and which therefore called upon the agent the more imperiously to neglect no opportunity of removing the false impression which his act of commission had contributed to make. The money had been paid over or settled on account without the suggestion of a possibility of reclamation. The agent was the party who sought reimbursement; and it was held that his silence for nine months after he had charged himself with the debt in a rendered account current, had made it his own, the propriety of which it is difficult to doubt. To show by specific evidence a consequential derangement of the principal's plans, and the exact amount of the loss suffered from it, would require him to expose his whole business, in all its ramifications and minute details: and to sustain it before a foreign tribunal, with all the books and papers of the house properly authenticated or proved, would be intolerably inconvenient if not impracticable. His other business would, in the mean time, be left to regulate itself, and it would be found better, in the end, to have given up the claim, than to have pursued it under so many disadvantages. Nor would a jury be able to estimate, with any degree of precision, the loss incurred from a sacrifice of means in providing for sudden and unexpected responsibilities, and from a consequent relinquishment perhaps of profitable speculations. These are considerations which make it more politic and just that the delinquent factor should, in such circumstances, take the responsibility of the debt and the risk of collecting it, than that the wronged principal should be driven to define the exact amount of his loss by proofs so vexatious and oppressive. Such is the principle of *Harvey* v. *Turner*; and do the circumstances of the case at bar fall within it? In respect to Young's debt, there was nothing to indicate that it might be relied on as a

[Brown v. Arrott.]

productive source of ready money. Its existence was intimated by an ordinary *account of sales*, which however intimated not that it might be depended upon as peculiarly available; and there consequently was no positive act productive of the confidence which is supposed to have been disappointed by the event. So far as regards the transmission of information, therefore, the jury had to do with an ordinary case of negligence falling within the general rule; and consequently nothing of that sort called upon them to give damages beyond the amount of the loss shown to have been actually suffered." 6 *Wharton* 23.

Thus you have the general rule stated as it was originally stated in this court; and though *Harvey* v. *Turner* is said by the Chief Justice to be a reasonable exception to the general rule, yet it is also said to be an exception resting on special circumstances. These special circumstances were not relied on when the decision and its able illustration and argument were given to the profession and to the community for their guidance: and for all practical purposes, as an authority in the law in reference to other cases, *Harvey* v. *Turner* is probably to be deemed as overruled. I do not think I misapprehend the intention of the Supreme Court when I make this remark. However, the general rule I state to you in the words of the Chief Justice, speaking the authoritative language of the Supreme Court. But there is another portion of the opinion of the Chief Justice which it is proper to bring to your view. He says, "It may, however, become a grave subject of inquiry before another jury, whether the defendant's supineness in suffering the goods to remain with Young after his apparent default in respect to remitting the proceeds of the bales sold at auction, ought not to fix him for the whole. If it turn out that Young failed to do what under the circumstances he was bound to do, it will be the business of the judge to charge that it was the defendant's duty to take the residue of the goods out of his hands; and failing to do so, it could not be said that the actual extent of the damage suffered is less than the value of the goods lost by it."

And this brings us to the other ground—a want of proper diligence in defendant in conducting the business with Young. He knew of sales of part of the goods in October, at 4 months, coming due in February, 1823. Whether he also knew that sales took place in November is another question. Young stopped payment in July, 1823, and the money had been left in his hands during that time. The defendant, to weaken or destroy the force of this part of the plaintiff's case, has introduced as witnesses, Comly, Cabot, Snelling and Richards. With a view to show that there was nothing calculated to excite suspicion in Young's omission to remit the amount of the sales made in the fall of 1822, it was proposed by the defendant to show by these witnesses, that in consignments to commission merchants between the different cities of the United States and between Philadelphia and Boston, it is

not, under ordinary circumstances, the practice to make or require partial remittances of occasional sales made before closing sales of the consignment. The defendant's counsel contended that, by the testimony, they have accomplished their purpose. The plaintiff denies this, and urges that the defendant is within the very exception put by the witnesses. I refer you to the precise language of the Chief Justice for my charge to you on this branch of the case, and leave the matters of fact for your own decision.

Again the plaintiff says, the defendant's case is defective because, by his omission to give notice, he deprives the plaintiff of all opportunity of exercising any control. What steps Brown might have taken it is too late now to say positively. Could he have learned something of Young? Would he not have directed the prompt collection from Young as credits expired? Would he not have given authority to compromise, and thus have received his portion of the $600 offered to Arrott, even if nothing had been obtained before that time? The plaintiff says he has had no opportunity of acting on these points; that he is entitled to the benefit of them now, and that it is fair and reasonable to hold the defendant responsible as if the plaintiff had had the opportunity and had done all that is suggested. The jury will decide. I have thus noticed all the points, as far as the court ought to notice them, in reference to Young's debt.

As to Folwell's debt I have but little to say. The sale to Folwell was made in June 1822, at 6 months. Was he a proper person to make sale to upon credit? If not, the defendant is responsible. If he was, then on this point no responsibility arises. But if, in relation to this debt, the defendant has incurred responsibility, either by selling to an improper person, or by neglecting to give due notice of material facts: then, under the rule laid down by the Chief Justice, the damages to be awarded are to be in proportion to the damages actually sustained.

Another point has been made by the plaintiff for the consideration of the jury. He urges that his letter of the 21st of June 1824, required an answer, and that the omission to answer is an acquiescence in the plaintiff's claim therein made. Of itself, as a matter of law, it has not been urged that it is to be considered. It is, therefore, for the jury to say whether the conduct of Arrott did or did not show an actual acquiescence. All this is for the jury. The case is now with you."

The plaintiff excepted to the charge. The judge then said, that as he believed he had obeyed the instructions of the Supreme Court, he desired the exception or exceptions to be specified. The plaintiff replied that he wished the Supreme Court to review their opinion given in this case. This request of the judge, and the reply thereto, the plaintiff objected to having inserted in this bill of exceptions, but the defendant insisted on it, and the judge believing it to be proper to do so, inserted the matter in the bill.

[Brown v. Arrott.]

The judge then also said that a number of written points had been handed to him by the defendant, all of which he believed he had sufficiently answered in the general charge, to which remark the defendant assented. The plaintiff insisting upon having these points annexed to the bill of exceptions, although no exception had been taken by either party to the answers of the court thereto, the judge deemed it his duty to submit them to the judgment of the Supreme Court. If that court should hold that they ought to be a part of the bill of exceptions, then he returned them as a part thereof.

Errors assigned:

I. Because the judge refused to strike out the two portions, or either of them, of David Arrott's deposition, objected to by the plaintiff.

II. Because the judge received the evidence of Samuel Comly, giving the opinion of the witness upon the merits of this case, and other similar cases, and not in proof of any usage or custom of trade.

III. Because the judge received the testimonies of Cabot, Snelling and Richards, upon the same points.

IV. Because the judge erred and misdirected the jury—

1. In his explanation of the course of the decisions of the Supreme Court in this case and the other cases referred to.

2. In referring the testimony of Comly and others to the decision of the jury under the opinion given by C. J. GIBSON on a former occasion.

3. In leaving it to the jury to determine as a question of fact, whether the plaintiff was entitled to recover his proportion of the $600.

4. In leaving the damages in reference to Folwell's debt to be determined as a question of fact by the jury.

5. In not instructing the jury that the defendant was liable for the whole amount of Folwell's debt, he having mixed it with his other funds and released Folwell without the knowledge of the plaintiff.

6. In leaving to the jury to determine whether the silence of the defendant, after the receipt of the plaintiff's letter of the 21st June 1824, and his omission to answer it, amounted to an acquiescence in its contents.

7. Because the judge should have directed the jury that under the circumstances the defendant could not recover back from the plaintiff what he had paid the plaintiff on account of the debt of either Young or Folwell.

This case was argued at March Term 1843, by *Randall*, for the plaintiff in error, and *M'Call* and *Cadwallader*, for the defendant in error; and was re-argued at this term by *Randall*, for the plaintiff in error, and *Cadwallader*, contra.

[Brown v. Arrott.]

The opinion of the Court was delivered by

KENNEDY, J. — The defendant having been the factor of the plaintiff, the latter seeks to charge the former in this action, among other things, with certain losses arising from sales made by the defendant or his sub-agent, of goods belonging to the plaintiff, which losses, as the plaintiff alleges, have accrued from the negligence and want of proper care on the part of the defendant. The counsel of the defendant, aware no doubt that it was the duty of their client, as the agent of the plaintiff, to show that he had kept him apprised of his doings, and that he had given him notice within a reasonable time of all such acts and circumstances as were important to his interest, lest by his neglect to do so he should be held liable to indemnify the plaintiff, offered to read in evidence the deposition of David Arrott, wherein, among other things, he testifies, "that the defendant gave this deponent particular instructions to see the plaintiff, and to inform him of the state of his consignment particularly, and the sales which had been made at Boston." And again, "that he visited the plaintiff at Dundee, and made him particularly acquainted with the state of his consignment and of the sales made at Boston;" but in his cross-examination he says, "when the deponent was at Dundee, he had no copy of account sales from Young, (meaning the defendant's sub-agent who made the sales at Boston), and of course showed none to the plaintiff." The first two recited clauses of this deposition were objected to as not being admissible in evidence, but the court thinking otherwise, overruled the objection, to which the counsel for the plaintiff took a bill of exception, which is the ground of the first error assigned.

It certainly was the duty of the defendant at all times to keep the plaintiff, his principal, apprised of his doings, and to give him notice within a reasonable time of all such acts and circumstances as were important to his interest; and if by his neglect to do this the plaintiff has suffered a loss, he is entitled to be indemnified by the defendant. From the evidence in the case, it appears that the defendant, in the latter end of September 1822, forwarded a portion of the plaintiff's goods consigned to him for sale, to James Young, of Boston, with instructions to sell the same there. That under the authority of the defendant, Young sold of the goods thus forwarded, in the following months of October and November, to the amount of about $720 nett, on a credit of four months, which became payable in the months of February and March then next following. And again in the months of March, April and May 1823, Young sold the residue of the goods of the plaintiff for the additional sum of $1167.70 nett, making in all, after defraying the charges and expenses attending the sales, the sum total of $1887.70. David Arrott, the witness, as he states in his deposition, visited the plaintiff at Dundee, in Scotland, in the month of August or September 1823, and although sales had been made

[Brown v. Arrott.]

in the months of October and November 1822, of nearly one-half of the goods forwarded to Young at Boston, a good part of a year before that, and the monies arising therefrom received by Young at least as early as February and March 1823, it does not appear that any attempt was ever made by the defendant to advise or notify the plaintiff of the sales at Boston, or the receipt of the monies thereon, in any form or manner whatever, until the time that David Arrott says he visited the plaintiff in August or September of the latter year.   The .question then presents itself, if the defendant had not been in default and guilty of neglecting his duty before that, by not having communicated to the plaintiff the account of the sales and monies received thereon at Boston, by Young, was the communication testified to have been made in regard thereto by David Arrott, such a statement and notice of what had been done and transacted relative to the sales at Boston, and the monies received thereon, as the defendant was bound to give in order to acquit himself from the imputation of neglect of duty as the plaintiff's agent, which otherwise might be brought against him ?   We are of the opinion it was not.   We think that it ought to have been in writing, and that it ought to have contained an account of the various sales made at different times, with their respective dates and the several sums of money received thereon by the sub-agent, as far as known to the defendant, or he had it in his power by reasonable diligence to inform himself.   But this was not done even verbally, as would appear from the narrative of the witness; nor is it credible that he could have given the plaintiff a verbal account of the whole transaction in detail, as he had no written statement of it himself at Dundee, when he saw the plaintiff.   We, therefore, consider that the court below erred in admitting those parts of the deposition of David Arrott to be read in evidence to the jury, which were objected to by the counsel for the plaintiff.

The second and third errors will be considered together, as they relate to the same point.   They are exceptions to the opinion of the court in admitting the testimony of Samuel Comly, Joseph Cabot, Samuel Snelling and Benjamin W. Richards, which was offered and given for the purpose of showing in effect that the defendant was not to be regarded as being guilty of negligence in suffering Young, his sub-agent at Boston, to receive the monies received by him on the sales made by him of certain parts of the goods before the whole were sold, and to use the same for the space of three or four months without even requiring him to pay over or forward the monies so received, and without taking any steps to obtain payment thereof until Young became insolvent and unable to pay, because, as the counsel for the defendant alleged and offered to prove by the witness just named, it was not usual for factors or agents to transmit to their principals or employers monies received by them, as long as any part of the whole con-

signment remained unsold, or if sold, as long as any portion of the monies to be paid thereon remained unpaid, when the honesty or ability of the agents or sub-agents were not questionable, and that such delay on the part of the latter to transmit the money actually received and coming to the employers, furnished no ground to suspect or believe that the money might be lost if suffered to remain until the sale of the whole quantity of the goods forwarded should be effected and the monies received thereon. Where the owner of the goods or the principal is advised from time to time by his agent of the sales as they are made, and again of the receipt of the monies as they are paid thereon, and according to the understanding that exists between them, arising either from a special agreement or a previous course of dealing between them, or the established usage or custom, if there be any, regulating the same, the principal or late owner of the goods is to call on his agent or factor and receive his money, or to draw upon him for it, the latter may retain it until it is demanded; but where the factor or agent is bound either by the agreement or previous course of dealing between them, or the usage of trade in regard thereto, to forward the money to his principal or employer, it is clearly his duty to do so, as he shall receive it, though it be only a part of what he expects, by the earliest opportunity, and no practice to the contrary will either justify or excuse his retaining it beyond such time, unless the sum shall be so small as not to justify the expense of forwarding it. Every principle of honesty and fair dealing would seem to require this of the factor or agent; and to allow him to indulge in doing otherwise, would inevitably, in many instances, prevent the principal or the employer from receiving his money forever : it would be placing the agent in a situation which might tempt him to use the money for his own purposes to the prejudice of his principal, which would be morally wrong and generally attended with injurious consequences to his principal. Besides, it is perfectly clear that if the agent uses the money, his interest is thereby immediately placed in direct opposition to that of his principal or employer, as to making sale of the residue of the goods; for as long as he has either occasion for the money received by him, or can use it to advantage, it becomes his interest to delay or put off the sale of the residue; or if he does sell, to sell on the longest possible credit, without regard to the interest of his employer or the owner of the goods, so that he may have the use of the money received by him during the interim. But it is well settled that no practice shall be sanctioned or in any way encouraged in an agent, that tends to place his own interest in direct opposition to the duty which he owes to his principal, because the temptation, perhaps, in many cases, would be too strong for resistance by men of flexible morals, and might ultimately lead to gross misconduct if not crime. The prohibition in this respect is positive, and has been found not only to be a salutary check against

[Brown v. Arrott.]

temptation and the practice of fraud, but to accord with sound policy and the purest principles of Christianity. And, indeed, the present case furnishes a striking illustration of the injurious consequences that seem too naturally to arise from such a practice as the witnesses were called to prove and spoke of in their testimony. Young, though a man of unblemished integrity and good credit in the estimation of his acquaintances, was tempted, under the indulgence of this practice, which the witnesses say is usually allowed to agents, to use the money received by him as agent for his own purpose; and where is it now? Lost forever. But had he forwarded it to the defendant as he received it, the plaintiff most probably would have received it without being compelled to sue for it. And here it may not be improper to consider the relation in which Young stood to the defendant. Young was his agent, as he was employed by him to act in his behalf without the knowledge or direction of the plaintiff. Young, therefore, became accountable to the defendant and not to the plaintiff, and bound to inform the defendant of all that he did under his commission within a reasonable time; and the defendant again, within the like time, was bound not only to acquaint the plaintiff with the same, but bound likewise not to suffer monies received by Young under his agency, to remain longer in his hands than was reasonable for its being forwarded or demanded, and if not forwarded or paid on demand being so made, then to use, without any unnecessary delay, the necessary means for enforcing payment. See *Cartwright* v. *Hateley*, (1 *Vez. Jr.* 292); *Pinto* v. *Santos*, (5 *Taunt.* 447); *Stephens* v. *Badcock*, (3 *Barn. & Adol.* 354). Seeing then that it was the duty of the defendant to have called on Young for payment of the monies received by him as often as he received the same, within a reasonable time thereafter, in the event of his failing to pay within such time of his own accord, and the money has been lost through the neglect of the defendant to call upon Young in the manner just mentioned for payment of it, the loss is fairly imputable to a failure on the part of the defendant to perform a duty which he was bound to the plaintiff to perform, and the plaintiff therefore entitled to claim indemnity from him. Under this view of this part of the case, we are satisfied that the testimony mentioned in the second and third errors ought not to have been received, and that the court erred in admitting it.

The fourth error is an exception to the charge given by the court to the jury. The first matter is the instruction given to the jury in relation to the loss of the money received by Young for the goods of the plaintiff sold by him, which arose from his appropriating the same to his own use, and becoming unable to make it good. It may be proper to premise that when the cause comes to be tried again, testimony mentioned in the second and third errors will be excluded, and, of course, what was said by the court to the jury in regard to it will and cannot be repeated, which will

[Brown v. Arrott.]

remove, in part, what is here excepted to. Before, however, we proceed to consider the instruction given to the jury in regard to the defendant's liability to make good this loss to the plaintiff, it will be proper to notice some of the other evidence given, which has a bearing on this part of the case, besides what has been already noticed in the discussion of the second and third errors. By a letter of the 22d October 1822, from Young, the defendant was advised of Young's having sold two bales of the plaintiff's goods, but without stating whether for cash or credit. By another letter, however, of the 13th November 1822, Young informed him that he had sold them on a credit of four months, and that he had made another attempt to sell the linens at auction, but the prices being unfavourable, he stopped the sale. He, to be sure, does not say expressly that any of the linens were then sold, but such fact might, perhaps, be inferred without going too far, or, if not inferred, it was sufficiently ambiguous to have put the defendant on inquiry in regard to it. And by his account of sales furnished afterwards in July 1823, it appears that he had sold on the 10th November, three days before his letter of the 13th of that month, $498.22 worth, some portion of which, most probably, was Lumgair's goods, as in his account he seems to blend the goods of the latter with those of the plaintiff. It therefore appears that the defendant was apprised in October and November 1822 of Young's having made sales of the plaintiff's goods, the prices of which were to become payable in the months of February and March following; yet he neglects to call on Young for the money, as it appears, or to mention a remittance thereof until the 22d May 1823, some two and a half or three months nearly after it had become payable, when he writes to Young that he had been expecting an account of the sales of the linens as far as they had been made, accompanied with a remittance for the same. But the defendant, in his letter dated the 28th of the same month, only six days afterwards, writes to Young that he need not make a partial remittance, but to push the sales to a close, and then remit the whole at once. And what renders the conduct of the defendant the more extraordinary and the less excusable in having delayed a demand of the remittance of the money received so long, is the circumstance disclosed by the letter of Young to the defendant of the 6th March 1823, wherein he acknowledges his inability to pay a note given by himself and one Thompson to the defendant, for money lent, which was about to become payable in a few days, and begs the defendant to take it out of bank, where it had been deposited. It is difficult to imagine why this letter of the 6th of March did not wake the defendant up to a state of vigilance, and induce him to insist upon the immediate payment of all the monies received by Young as his agent, and if not paid instanter, to have gone further, and taken the goods still remaining unsold out of his hands, unless it was that he wished to have his own debt for the money lent paid

[Brown v. Arrott.]

first.   But the plain consequence of this not having been done by the defendant, is, that the money then received, as also all the goods remaining unsold, have been lost to the plaintiff, so far as Young is concerned.   And why should not the defendant indemnify the plaintiff for the whole amount of his goods sold by Young, seeing it was his duty to have proceeded as has just been suggested?   And what rendered it still more imperatively the duty of the defendant to have done so, was, that the plaintiff at that time was pressing him to remit him all the monies he could obtain. The evidence, as it appears to me, shows not only an entire want of vigilance on the part of the defendant to secure the payment of the money received by Young, and the goods in his hands from being lost to the plaintiff, but a degree of negligence also that is unaccountable, as well as culpable, in not even advising the plaintiff by writing that he had forwarded any portion of his goods to Boston and placed them in the hands of Young, there to be sold for his benefit, until some nineteen or twenty months afterwards, when Young had sold the goods and appropriated the proceeds to his own use something like eleven months previously, and become insolvent at least nine months.   Thus all information was withheld by the defendant from the plaintiff in regard to these goods, so *that the latter* had it at no time in his power to give any advice to the defendant as to what he had better do in order to secure the goods or the monies arising therefrom in the hands of Young from being lost.   That it was the duty of the defendant to have advised the plaintiff of his having sent the goods in question to Boston, within a reasonable time at least thereafter, cannot be denied, as also to have notified him from time to time of the sales made thereof and the monies received thereon by Young, so that the plaintiff might have been enabled to judge for himself, and to have directed the defendant what to do under the existing circumstances as they occurred, in order to guard against any loss or detriment that might otherwise occur.   The defendant, however, having neglected everything of the sort, is it not reasonable and just that he should be held responsible for any loss that has happened, which possibly might have been avoided had he only performed his duty to the plaintiff as his agent?   It appears to be contrary to every principle of natural justice, as well as sound policy, to say that he ought or would not be answerable for such loss.   Indeed, it seems to me, that it would not be going too far to hold, under the circumstances of this case, that the defendant by his conduct had impliedly agreed to be answerable to the plaintiff for any loss that should arise from the default of Young.   But the evidence, besides showing most incontestably the neglect of the defendant to perform his duty, tends also strongly to prove that if he had used ordinary diligence in the performance of it, the loss which has arisen immediately from the infidelity and insolvency of Young, in all probability, would not have accrued.   And if any

[Brown v. Arrott.]

doubt existed whether the actual loss sustained by the plaintiff was equal to the value or price of the goods or not, it being proven that a breach of duty had been committed on the part of the defendant, tending to produce the loss, it lay on him to remove the doubt by giving testimony showing what the amount of the actual loss was. The court below, however, seem, as it appears to me, to have.instructed the jury differently, by holding out the idea to them that it rested with the plaintiff to show the amount of the actual loss. If the court intended to impress the jury with this notion, we are of opinion that it erred. For it is evident, if such a rule were to be applied to the plaintiff in cases like the present, he would go without redress, in many instances, where his agent by his negligence has caused a loss equal to the value of the property committed to his care. While the property is in the possession and care of the agent, he must be supposed to be cognizant of all that happened to it, and of the actual loss which his want of due care and diligence may have occasioned to his principal, whereas the principal may well be presumed to know but little, if anything about it, and hence it is nothing more than reasonable that the burthen of proof, as to the amount of the actual loss sustained by the plaintiff, should lie upon the defendant in such cases. This accords with what is advanced by Mr Justice ROGERS in *Beckman* v. *Shouse*, (5 *Rawle* 189, 190); and by Chief Justice SAVAGE in *Beardslee* v. *Richardson*, (11 *Wend*. 25). But in this case the evidence established the delinquency of Young beyond all question, in his converting the monies arising from the sale of the plaintiff's goods to his own use; and likewise a total neglect of duty, on the part of the defendant, in not demanding the monies as received by Young, and in not taking the goods then unsold out of his possession, when he discovered that he was unable to meet his pecuniary engagements, and especially if Young had failed, on demand, to pay the money immediately which he had previously received. The court, therefore, ought to have told the jury, in plain terms, that the defendant had rendered himself liable to the plaintiff for the full value of the goods placed in the hands of Young, or at least for the amount of money produced by the sales made of them. This direction would have been in conformity. also to the opinion of this court as expressed by the chief justice on a former writ of error in this case. 6 *Whart*. 24. It does not, however, appear to have been given, but it seems to have been submitted by the court to the jury to decide the question of damages, without laying down any rule as a measure for them to go by, other than in general terms that they ought to be equal to the actual loss.

The only remaining matter intended to be noticed is the Folwell debt, amounting to $283.50, created by a sale made by the defendant of a portion of the plaintiff's goods to John Folwell in the latter end of June 1822, on a credit of six months. To secure

[Brown v. Arrott.]

the payment of this debt the defendant took a note of Folwell, payable to himself, including in it a debt of $138.84 owing to himself on his own account. It is not deemed material to consider whether the credit of Folwell was such as to make it prudent to sell to him on a credit of six months. One witness says it was *pretty* good; that it was such as induced the witness to sell to him, by which he lost; and another witness testifies, that his standing was equal to any of the jobbing or piece-men—was about the first in the market; but whether it was usual to sell to such men on a credit of six months, does not appear. What the credit of Folwell was among business men at the time the defendant sold to him, is considered unimportant, because we are of opinion that he made the debt his own by blending it with his own debt, and afterwards releasing Folwell from the payment of it as his own, without any authority from the plaintiff to do so. Having thus made the debt his own, he became and remains liable to the plaintiff for payment of the amount of it with interest thereon. This case may be considered not unlike the case of an agent (only stronger, as the defendant here released the debt) who improperly, and contrary to his known duty or the habits of business, deposits the money of his principal in his own name, with a banker who fails; the agent, in such case, becomes responsible to his principal for the money lost by the failure. *Massey* v. *Banner*, (1 *Jac.* & *Walk.* 245–8); 4 *Madd.* 413; *Story on Agency* 188, *pl.* 200. Because, as was said in *Wren* v. *Kirton*, (11 *Vez.* 382), he cannot so deal with his principal's money as that if the banker's solvency continue he may be in a condition to treat it as his own, and if insolvency happen, he may escape by considering it as belonging to his principal. *Paley on Agency* 45, (2d *Amer.* edit. 1822). This reasoning is directly applicable to the defendant in this case, who, having taken the note in his own name of Folwell, including money coming to himself on his own account, had it in his power, as long as Folwell continued solvent, to treat the whole of it as his own; but Folwell having become insolvent without paying the note, the defendant wishes to escape from the loss by showing that the note was taken to secure money coming to the plaintiff, as well as himself. The authority cited, however, would seem to be opposed to his doing so. But without deciding the point on this ground alone, we think that the additional circumstance of the defendant's having released Folwell from the debt upon a composition made with him, without any authority from the plaintiff, renders him liable to the plaintiff for the amount of it.

Judgment reversed, and a *venire facias de novo* awarded.